UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THOMASDINH NEWSOME
BOWMAN,

                Petitioner,

     v.

MELISSA ANDREWJESKI,

                Respondent.

CASE NO. 2:22-cv-00316-DGE-JRC

REPORT AND RECOMMENDATION

NOTED FOR: December 2, 2022

The District Court has referred this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to Chief United States Magistrate Judge J. Richard Creatura, as authorized by 28 U.S.C. § 636(b)(1) and local Magistrate Judge Rules 3 and 4.

Petitioner Thomasdinh Bowman challenges his 2015 conviction and sentence for one count of murder in the first degree in King County superior court. Petitioner has raised eight claims for relief in his petition, all asserting ineffective assistance of trial counsel. Three of those claims are not properly exhausted and now are procedurally defaulted so as to preclude review on the merits in federal court. The remaining five claims were addressed on the merits by the

state courts who did not unreasonably apply clearly established federal law when they concluded

that petitioner was not entitled to relief. Therefore, none of petitioner's claims warrant granting

his petition. Accordingly, the habeas petition should be denied.

## BACKGROUND

**I.    Background**

**A.    Factual Background**

On December 11, 2014, in the King County superior court, a jury found petitioner guilty of murder in the first degree. Dkt. 17, Ex. 23, at 77. On January 2, 2015, petitioner was sentenced to a standard range sentence of 290 months plus 60 months for a firearm enhancement, for a total incarceration period of 350 months. *Id*. at 77–81. Division One of the Court of Appeals of Washington ("Division One") summarized the facts of petitioner's case as follows:

> Around 7:30 p.m. on August 31, 2012, witnesses heard five gunshots at the intersection of 15th Avenue N.E. and N.E. 75th Street in Seattle's Roosevelt neighborhood. They heard an engine accelerate and saw a silver BMW Z4 convertible with the top down speed off southbound.

> Police responded to reports of multiple gunshots and a male bleeding inside a red Subaru. The male, identified as Yancy Noll, was sitting in a normal position in the driver's seat with his hands on the steering wheel. He had four fatal gunshots to the head. The Subaru's windows were intact, but there was glass in the street on the Subaru's side. Investigators concluded the glass came from the shooter's car window.

> A description of the silver BMW, a still image of the car taken from a nearby surveillance video, and a sketch of the suspect BMW driver based on witness descriptions were released to the public. As a result of a tip, police began investigating Thomasdinh Bowman, who had a silver BMW in his driveway less than 10 blocks from the scene of the crime.

> On the night of the killing, Bowman turned off his cellphone and purchased a new one that he registered using a false identity, Peter Nguyen. Using that name, Bowman called a BMW store and an auto glass company the following morning to ask about having a window replaced on his 2006 silver BMW Z4. That day, Bowman and his wife drove the BMW to Portland and had the passenger window replaced. Bowman paid the $250 bill in cash.

After the window was replaced, Bowman kept the BMW in his garage. Between September 12, and September 20, 2012, Bowman spray painted the silver BMW wheels black. On September 20, Bowman purchased four tires for his BMW from Big O Tires in Lynnwood, paying in cash. Bowman did not bring the car to the store; he only bought the wheels. The sales manager was surprised the tires were being replaced because they were like new.

Police searched Bowman's workplace and found a slide from a Glock handgun inside a storage container. Forensic experts concluded the cartridge casings found at the scene of the shooting were fired from that particular Glock slide. Bowman's workplace computer contained a collection of documents relating to the investigation of shootings: "Forensic Gunshot Residue Analysis," "Chemical Analysis of Firearms, Ammunition, and Gunshot Evidence," "Gunshot Wounds—Practical Aspects of Firearms, Ballistics, and Forensic Techniques," "Advances in Fingerprint Technology," "Automated Fingerprint Identification Systems," "Forensic Interpretation of Glass Evidence," and "Arrest-Proof Yourself." Two more documents found on the computer were guides to committing murder.

The State charged Bowman with first degree murder. At trial, Bowman admitted to shooting Noll in self-defense. He testified that he cut Noll off in traffic; Noll became angry, pursued Bowman, yelled a threat, and threw a water bottle onto Bowman's car as they drove onto the freeway. Bowman claimed he tried to get away from Noll, but Noll pursued him off the freeway and to the intersection where the shooting occurred. Bowman testified that Noll threw another bottle at his BMW that hit Bowman in the back of the head. Bowman claimed he saw Noll searching for something in the passenger seat, and it was then that Bowman pulled his Glock handgun out of his bag and shot Noll.

Bowman admitted going out to dinner with his wife after killing Noll. Later that night, he disassembled his handgun and disposed of the barrel because he thought it could be used to link the gun to the killing. [court footnote: Bowman testified that he kept the slide of the gun because he did not believe it could be used to match ballistic evidence to the gun.] Bowman claimed he also disposed of the bottles Noll threw at him.

The jury found Bowman guilty as charged. At sentencing, Bowman argued that the trial court should consider as mitigation that he acted in self-defense. The court responded, "The jury rejected it as do I."[ ] The court observed that Noll had his hands on the steering wheel when he was shot. It further observed that Bowman's actions after the shooting were inconsistent with a person who had just escaped serious injury by an enraged motorist, specifically going out to dinner and disposing of the only evidence that would support his version of events. The court imposed a sentence within the standard range.

Dkt. 14-1, Ex. 1, at 3–5.

B.      **Procedural Background**

Petitioner challenged his conviction and sentence on direct appeal. *See* Dkt. 14-1, Ex. 3. Division One affirmed petitioner's conviction on January 23, 2017. *See* Dkt. 14-1, Ex. 1. Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *See* Dkt. 14-1, Ex. 10. On June 28, 2017, the state supreme court denied petitioner's petition for review without comment. *See* Dkt. 14-1, Ex. 15. Division One issued its mandate on August 18, 2017. *See* Dkt. 14-1, Ex. 16. Petitioner did not file a petition for writ of certiorari in the United States Supreme Court.

On August 20, 2018, petitioner filed a personal restraint petition ("PRP") seeking state post-conviction relief. Dkt. 16, Ex. 18. Division One dismissed the PRP on March 22, 2021. Dkt. 14-1, Ex. 2. On April 20, 2021, petitioner sought discretionary review from the state supreme court, which was denied by the commissioner of the state supreme court on September 8, 2021. Dkt. 17, Exs. 27, 28. Petitioner moved to modify the commissioner's decision. Dkt. 17, Ex. 29. The state supreme court denied the motion to modify without comment and Division One issued its certificate of finality on February 15, 2022. Dkt. 17, Exs. 30, 31.

On March 15, 2022, petitioner initiated this case. Dkt. 1. In his amended petition (Dkt. 4), petitioner raises the following claims for relief:

1. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to move to suppress evidence obtained from his hard drives without authorization.

2. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to investigate and call a forensic computer expert.

3. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to investigate and call a mental health expert.

     4.  Petitioner was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to object to the trial court's admission of limited passages from a book and manual.

     5.  Petitioner was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to request a lesser-included jury instruction when a decision to go "all or nothing" was not reasonable based on the State's evidence at trial.

     6.  Petitioner was denied his constitutional right to effective assistance of counsel when defense counsel stated in his opening statement that petitioner had never spoken of self-defense to anyone before trial, as the State on cross-examination was able to question petitioner about whether he talked about the incident with his wife, parents, best friend and police when the statement was not strategic and was of no benefit to petitioner.

     7.  Petitioner's trial counsel was ineffective when, after opening the door in opening statements, counsel failed to timely and adequately object when the State improperly questioned petitioner about privileged spousal communications.

     8.  Petitioner's trial counsel was ineffective when, after opening the door in opening statements, counsel failed to timely and adequately object to the State's questions referencing petitioner's constitutionally protected right to silence.

Dkt. 4. On July 6, 2022, respondent filed, and served on petitioner, a response to the petition. Dkt. 13. In the response, respondent asserts that petitioner did not exhaust several claims for relief in the state courts prior to filing the petition, and the state court's adjudication of the remaining claims raised in the petition was not contrary to, or an unreasonable application of, clearly established federal law. *Id*. Petitioner filed a reply on October 7, 2022. Dkt. 26. Respondent filed a traverse on October 14, 2022. Dkt. 29.

## DISCUSSION

     Respondent argues that petitioner has not exhausted his state remedies with respect to claims 6–8 and those claims are now procedurally defaulted. Dkt. 13 at 46–49. In the alternative, respondent claims that these claims are conclusory in nature and fail to state valid habeas claims. *Id*. at 40–46. Further, respondent maintains that the state court's adjudication of claims 1–5 in the

1    petition was not contrary to, or an unreasonable application of, clearly established law. *Id.* at 18–

2    40. As exhaustion and procedural default are threshold matters, the Court will discuss claims 6–8

3    before addressing the merits of claims 1–5.

4    **I.      Exhaustion and Procedural Default – Claims 6, 7, 8**

5            **A.      Exhaustion of State Remedies**

6            Petitioner may pursue federal habeas relief only after he has exhausted his state judicial

7    remedies. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). The exhaustion of state court

8    remedies is a prerequisite to the granting of a petition for writ of habeas corpus. 28 U.S.C. §

9    2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the highest state

10   court with a full and fair opportunity to consider all claims before presenting them to the federal

11   court. *Picard v. Connor*, 404 U.S. 270, 276 (1971); *Middleton v. Cupp*, 768 F.2d 1083, 1086 (9th

12   Cir. 1985). Full and fair presentation of claims to the state court requires "full factual

13   development" of the claims in that forum. *Kenney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992). A

14   petitioner bears the burden of proving he has exhausted available state remedies and retains the

15   burden to prove all facts relevant to the exhaustion requirement. *See Rose v. Lundy*, 455 U.S.

16   509, 520 (1982); 28 U.S.C. § 2254(b)(1)(A).

17          In the petition, petitioner raises three grounds for relief asserting ineffective assistance of

18   trial counsel he did not raise in the state courts. Dkt. 4 at 20–27. As petitioner did not raise these

19   three grounds in the instant petition on direct appeal or collateral review, he did not give the state

20   court a full and fair opportunity to determine if a federal constitutional violation occurred. *See*

21   *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary

22   'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court

23   (including a state supreme court with powers of discretionary review), thereby alerting that court

24

1   to the federal nature of the claim."); *Ortberg v. Moody*, 961 F.2d 135, 138 (9th Cir. 1992)

2   (finding claims were unexhausted when they were not raised on every level of direct review).

3   Thus, claims 6, 7, and 8 of the petition (Dkt. 4) were not properly exhausted.

4   **B.    Procedural Default**

5       Claims 6, 7, and 8 are also procedurally defaulted. Procedural default is distinct from

6   exhaustion in the habeas context. *Franklin v. Johnson*, 290 F.3d 1223, 1230 (9th Cir. 2002). The

7   procedural default rule bars consideration of a federal claim when it is clear the state court has

8   been presented with the federal claim but declined to reach the issue for procedural reasons or it

9   is clear the state court would hold the claim procedurally barred. *Id.* at 1230-31 (citations

10  omitted). If a state procedural rule would now preclude the petitioner from raising his claim at

11  the state level, the claim is considered "procedurally defaulted" and the federal courts are barred

12  from reviewing the petition on the merits. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).

13      Claims 6, 7, and 8 are procedurally defaulted because if petitioner attempted to

14  collaterally challenge these claims in a subsequent collateral attack, the state court would find the

15  claims barred by Washington State law. Washington State imposes a one-year statute of

16  limitations on filing a post-conviction collateral attack. RCW § 10.73.090.

17      "'[C]ollateral attack' means any form of postconviction relief other than a direct appeal.

18  'Collateral attack' includes, but is not limited to, a personal restraint petition, a habeas corpus

19  petition, a motion to vacate judgment, a motion to withdraw guilty plea, a motion for a new trial,

20  and a motion to arrest judgment." RCW 10.73.090(2). Here, petitioner's convictions became

21  final on August 18, 2017, the date the direct appeal mandate was issued. Dkt. 14-1, Ex. 16; RCW

22  10.73.090(3)(b). Thus, the time to file a petition or motion for post-conviction relief expired on

23

24

1    August 18, 2018. *See* RCW 10.73.090(1), (3)(b). As the one-year statute of limitations has

2    passed, petitioner is barred from filing a subsequent collateral attack in state court. *See id.* at (1).

3    Petitioner would be precluded from asserting these three grounds raised in the petition in

4    state court, and thus, these claims are procedurally defaulted in federal court. *See Coleman*, 501

5    U.S. at 731-32, 735 n.1; *Casey v. Moore*, 386 F.3d 896, 920 (9th Cir. 2004); *Eisermann v.*

6    *Penarosa*, 33 F.Supp.2d 1269, 1274 (D. Haw. 1999) ("[I]f a petitioner has never raised his

7    federal claim to the highest state court available and is now barred from doing so by a state

8    procedural rule, exhaustion is satisfied because no state remedy remains available, but the

9    petitioner has procedurally defaulted on his claim.").

10    However, procedural default will be excused and a petitioner will be entitled to federal

11    habeas corpus review if he "can demonstrate cause for the default and actual prejudice as a result

12    of the alleged violation of federal law, or demonstrate that failure to consider the claims will

13    result in a fundamental miscarriage of justice[.]" *See Boyd v. Thompson*, 147 F.3d 1124, 1126

14    (9th Cir. 1998) (citing *Coleman*, 501 U.S. at 750). To establish "cause," a petitioner must show

15    some objective factor external to the defense prevented him from complying with the State's

16    procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)).

17    To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the

18    errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and

19    substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

20    *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

21    Only in an "extraordinary case" may the habeas court grant the writ without a showing of

22    cause and prejudice to correct a "fundamental miscarriage of justice" where a constitutional

23    violation has resulted in the conviction of a defendant who is actually innocent. *Murray,* 477

24

1  U.S. at 495–96. To demonstrate he suffered a fundamental miscarriage of justice, viewing all the

2  evidence in light of new reliable evidence, the petitioner must show "it is more likely than not

3  that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v.*

4  *Bell*, 547 U.S. 518, 537 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

5      In the instant petition, petitioner appears to argue that his counsel on appeal was

6  ineffective for failing to raise the defaulted claims, stating that each claim was "overlooked," and

7  thus that this ineffectiveness constitutes cause for the default. Dkt. 4 at 21–26. This contention

8  has no merit. Petitioner has not shown that "some objective factor external to the defense

9  impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488.

10  Further, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or

11  failed to raise the claim despite recognizing it, does not constitute cause for a procedural

12  default." *Murray*, 477 U.S. at 486. Petitioner has not shown cause for the defaults, so the Court

13  need not reach the issue of prejudice. *See Thomas v. Lewis*, 945 F.2d 1119, 1123 n.10 (9th Cir.

14  1991) (stating a finding of lack of cause eliminates the need to discuss whether the petitioner was

15  prejudiced).

16      Petitioner has also failed to present any new evidence demonstrating that it is more likely

17  than not that no reasonable juror would have convicted him in light of any new evidence, thus

18  demonstrating a fundamental miscarriage of justice. *See House*, 547 U.S. at 537. Petitioner

19  simply did not raise these claims in his petition at all levels of state court. Accordingly, petitioner

20  has made no showing of cause or prejudice or a fundamental miscarriage of justice. Because

21  petitioner cannot excuse his procedural default as to these three claims, they are not cognizable

22  in a habeas proceeding and should therefore be dismissed.

23

24

1    Based on the foregoing, the Court declines to address respondent's alternative argument

2    that these claims should be dismissed for lack of merit. *See* Dkt. 13. In addition, the Court need

3    not reach the issue of timeliness because respondent does not raise the issue and as is already

4    noted, petitioner's claims are unexhausted and procedurally defaulted.

5    **II.    Merits Review - Claims 1–5**

6        Respondent concedes that the remaining claims in petitioner's habeas petition have been

7    exhausted in state court and, therefore, can be addressed on the merits. Dkt. 13. The Court will

8    first set forth the standard of review under AEDPA for these claims. Also, because each claim

9    alleges ineffective assistance of counsel, the Court will set forth that standard before addressing

10   the merits of each claim. Any other relevant standards will be presented at the time the particular

11   relevant issue is addressed.

12   **A.    Legal Standard – AEDPA Merits Review**

13       The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation

14   of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28

15   U.S.C.] §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). 28 U.S.C. §

16   2254 is a "difficult to meet and highly deferential standard for evaluating state-court rulings,

17   which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*,

18   563 U.S. 170, 181 (2011) (internal quotations and citations omitted). The petitioner carries the

19   burden of proof. *Id*.

20       The first exception, § 2254(d)(1), allows habeas relief on the basis that an adjudication

21   "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

22   established Federal law, as determined by the Supreme Court of the United States." The Supreme

23   Court has ruled that a state decision is "contrary to" clearly established Supreme Court precedent

24

1    if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court

2    on a question of law or (2) confronts facts "materially indistinguishable" from relevant Supreme

3    Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

4    Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that

5    court concludes in its independent judgment that the relevant state-court decision applied clearly

6    established federal law erroneously or incorrectly. Rather, that application must also be

7    unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable

8    application of Supreme Court precedent occurs "if the state court identifies the correct governing

9    legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular

10   state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an

11   unreasonable application of Supreme Court precedent "if the state court either unreasonably

12   extends a legal principle from [Supreme Court] precedent to a new context where it should not

13   apply or unreasonably refuses to extend that principle to a new context where it should apply."

14   *Id.*

15          The second § 2254 exception, § 2254(d)(2), provides for habeas relief if the adjudication

16   "resulted in a decision that was based on an unreasonable determination of the facts in light of

17   the evidence presented in the State court proceeding." Federal habeas courts must presume the

18   correctness of state courts' factual findings unless applicants rebut this presumption with "clear

19   and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under

20

21

22

23

24

§ 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 180–81.

### B.    Ineffective Assistance of Counsel

To prevail on a claim that counsel rendered ineffective assistance, a petitioner must show both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Moreover, when reviewing a habeas claim that counsel rendered ineffective assistance, the Supreme Court has explained—

> the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself. A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.

*Richter*, 562 U.S. at 101 (internal citations omitted).

### C.    Claim 1

In claim 1, petitioner argues that trial counsel was ineffective for failing to move to suppress evidence from petitioner's computer hard drives that was beyond the scope of a search warrant. Dkt. 4 at 6. Specifically, petitioner claims that police had a search warrant that authorized only a search and seizure of any information on petitioner's computer or hard drives relating to the repair of damage to the BMW. *Id*. He claims that police exceeded the scope of the

1  search warrant by seizing other evidence relating to shootings and murders and so counsel should

2  have objected to its admission at trial. *Id*. Respondent counters that, because police in fact

3  conducted a lawful search and seizure, the state court reasonably rejected petitioner's claim that

4  counsel was ineffective for not moving to suppress the evidence. Dkt. 13 at 21–24.

5      Division One rejected this claim because petitioner failed to demonstrate that police

6  conducted an illegal search and, therefore, he could not show a violation of the right to effective

7  assistance of counsel for failing to object to the admission of the evidence obtained during the

8  search. The court applied both state and federal law, holding,

9          A warrant must describe with particular[ity] the place to be searched, and
           the persons or things to be seized. *State v. Perrone*, 119 Wn.2d 538, 545, 834 P.2d
10         611 (1992). The description is generally valid if it is as specific as the nature and
           circumstances permit. *Perrone*, 119 Wn.2d at 546. Here, the warrant provided that
11         Bowman's business, Vague Industries, would be searched, including any desktop
           and laptop computers, hard drives or other electronic data storage devices. The
12         warrant specifically provided that detectives sought "any evidence relevant to the
           homicide of Yancy Noll," from Bowman's cell phone, laptop, and iPad.

13
               The warrant specifically authorized the search and seizure of any computers
14         or hard drives. Even if, as Bowman contends, officers were limited to discovery
           relating to the BMW repairs on the hard drive, our Supreme Court has recognized
15         that officers who are executing a search warrant for documents relating to specific
           transactions must by necessity examine documents not specifically listed in the
16         warrant to determine whether they are among documents to be seized. *State v.
           Stenson*, 132 Wn.2d 668, 694, 940 P.2d 1239 (1997). "Where officers executing a
17         search warrant find evidence not described in the warrant and not constituting
           contraband or instrumentalities of crime, the officers may seize the evidence if it
18         will aid in a particular apprehension or conviction, or has a sufficient nexus with
           the crime under investigation." *Stenson*, 132 Wn.2d at 695. Because the police did
19         not wrongfully seize this material, counsel was not ineffective by not moving to
           suppress the hard drive.
20
   Dkt. 14-1, Ex. 2, at 36–37.
21
22     Here, petitioner has not shown the state court decision finding his counsel was not

23  ineffective was contrary to, or an unreasonable, application of clearly established federal law, or

24  that it was based on an unreasonable determination of the facts. Specifically, petitioner contends

1   his counsel was ineffective for failing to challenge that the search warrant lacked the necessary

2   particularity required for the searches of petitioner's computer hard drives. Dkt. 4 at 6. In its

3   decision on this claim, the state court considered the validity of the search warrant and

4   determined it was valid. *See* Dkt. 14-1, Ex. 2, at 36–37. The court properly set forth the

5   particularity requirement of a search and seizure under the Fourth Amendment. Also, it relied on

6   *Stenson*, a case that expressly notes Supreme Court precedence, for the particularities of

7   executing a search warrant. *See* Dkt. 14-1 at 37 (citing *Stenson*, 132 Wn.2d at 694 (quoting

8   *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)).

9        The record supports the state court's determination. A plain reading of the 3-page search

10  warrant shows that police were authorized to seize, among other things,

11       any evidence relating to the homicide of Yancy Noll, including without limitation
         any data or information regarding possible repair work done to the BMW, including
12       without limitation a window, paint, new tires, a humidifier, etc.; and any activity
         regarding the investigation, research and/or repair of damage to the BMW; and a
13       complete forensic search of said laptop/notebook.

14  Dkt. 17, Ex. 23, at 122. While petitioner maintains at great length that the warrant only

15  authorized police to search for evidence of repair to his BMW and, therefore, police exceeded

16  the scope of the warrant, (*see* Dkt. 26 at 9–32), a plain reading of the warrant clearly belies his

17  assertion. Rather, the warrant authorized police to search for *any evidence* relating to the

18  homicide at a number of locations including Vague Industries, where the hard drives were

19  located. Dkt. 17, Ex. 23, at 122. In addition to seizing evidence related to the repair of the BMW,

20  the warrant authorized police to seize guns, ammunition, surveillance equipment and related

21  recordings, vehicle GPS systems, sunglasses, cellular telephones, any trace evidence, and

22  medical records. *Id*. at 122–23. As such, petitioner has not shown a challenge to the validity of

23  the search warrant had merit. "The failure to raise a meritless legal argument does not constitute

24

REPORT AND RECOMMENDATION - 14

1   ineffective assistance of counsel." *Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir. 1989)

2   (quotation marks and citation omitted).

3       Further, as petitioner has failed to establish that the state court's decision here was

4   unreasonable, petitioner also cannot show there is a reasonable probability any motion

5   challenging the validity of the search warrant or attempting to suppress the evidence obtained

6   during the search would have been granted and the outcome of petitioner's trial would have

7   changed. *See Lowry v. Lewis*, 21 F.3d 344, 346–47 (9th Cir. 1994) (to show prejudice, the

8   petitioner "must establish that had the motion [to suppress] been filed, there was a reasonable

9   probability that the evidence would have been suppressed, and the outcome of the trial would

10  have been different had the evidence been suppressed."); *see also Richter*, 562 U.S. at 112 (the

11  question is not whether counsel's performance had no effect or whether it is possible a

12  reasonable doubt might have been established if counsel acted different, but whether it is

13  "reasonably likely" the result would have been different). Accordingly, the Court recommends

14  that claim 1 be denied.

15      **D.    Claim 2**

16      In claim 2, petitioner argues that trial counsel was ineffective for failing to retain a

17  separate defense computer expert. Respondent counters that, without proof that such an expert

18  would have provided a favorable opinion, petitioner cannot show that counsel was

19  constitutionally ineffective. Dkt. 13 at 24–28.

20      The state courts applied the *Strickland* standard in determining that counsel was not

21  ineffective here. Dkt. 14-1, Ex. 2, at 30–33. Specifically, Division One found:

22          Bowman first argues that his trial counsel was ineffective for failing to
        consult a computer expert to counter the State's computer expert. [court footnote:
23      In this argument, Bowman also contends that his attorney did not adequately
        prepare for trial, did not review discovery, and put off a serious hand surgery.

24

Ultimately, all of these contentions by Bowman are conclusory statements, unsupported by evidence, that do not support an ineffective assistance of counsel claim.]

"The Sixth Amendment right to effective assistance of counsel includes expert assistance necessary to an adequate defense." *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006). However, the decision of whether to call a defense expert can be strategic. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 493, 251 P. 3d 884 (2010). Tactical decisions will not support a claim of ineffective assistance of counsel. *Mannering*, 150 Wn.2d at 286. In general, the decision to call a witness will not support an ineffective assistance of counsel claim. *State v. Thomas*, 109 Wn. 2d 222, 230, 743 P.2d 816 (1987).

At trial, the State's expert, Detective Hansen, testified about the documents found on Bowman's computer that discussed concealing the evidence of a crime. Documents found included: "Forensic Gunshot Residue Analysis," "Chemical Analysis of Firearms, Ammunition, and Gunshot Residue," "Gunshot wounds—Practical Aspects of Firearms, Ballistics, and Forensic Techniques," "Advances in Fingerprint Technology," "Automated Fingerprint Identification Systems," "Forensic Interpretation of Glass Evidence," and "Arrest–Proof Yourself." Detective Hansen also located excerpts from the Book [Murder, Inc.] and the Manual [The Death Dealer's Manual]. Additionally, Detective Hansen discovered subfolders on the hard drive among which were titled "Combat," "Firearms," "Explosives," and "Mischief." He opined that "these are names that a person would likely assign rather than a machine . . . because the contents of the documents found within those files correspond to the name of the folder."

Bowman testified that he bundle downloaded many eBooks, including the Book and the Manual, without intending to read them. Bowman explained that because he had bundle downloaded thousands of documents, there was no way he could have read all the eBooks.

Bowman argues that his trial counsel should have called an expert to opine about when the documents were created and accessed to support his argument that he bundle downloaded the incriminating materials and never read them. Bowman submitted the declaration of Larry Randall Karstetter, the president and owner of Data Forensics Lab, to support this argument. Karstetter searched Bowman's computer and found "evidence of a batch of files being downloaded or copied onto the drive at the same time as opposed to a user picking and choosing each file to download," and opined that the Manual and the Book were bundle downloaded.

Karstetter was asked to determine whether any computer user ever opened and viewed the contents of the Book and the Manual. Karstetter looked at the dates on which the files were first created and last accessed. He determined that the Bool was created on October 10, 2011, and last accessed on June 12, 2012, and that the Manual was created on August 9, 2011, and last accessed on May 19, 2012.

Karstetter opined that the dates on which these documents were last accessed were the same dates as thousands of other files on the computer, indicating that they were not actually opened and read by the user but were instead simply scanned for viruses or backed up.

This evidence would have strongly corroborated Bowman's testimony that he never opened or read the Book or Manual, thereby undercutting the State's theory that Bowman used these documents as instruction manuals on how to commit murder. But there may have been legitimate strategic reasons for not calling an expert such as Karstetter to testify. In general, "the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *In re Pers. Restraint of Lui*, 188 Wn. 2d 525, 545, 397 P.3e 90 (2017).

Detective Hansen testified that between the day of Noll's murder, August 31, 2011, and September 4, 2012, a user accessed several PDF files on the computers, including an article about gunshot residue in cars, an article on the advances in fingerprint technology, an article on automated fingerprint identification systems, and the article entitled "Arrest–Proof Yourself." Hansen also testified he was able to determine that Bowman viewed Noll's Facebook page on September 18, 2012. Karstetter indicated in his report that he could confirm 118 files were opened by a user. A spreadsheet attached to the report confirms that the PDF files discussed by Detective Hansen were accessed between August 31, 2011, and September 4, 2012. Had Karstetter been called to the stand, he may have corroborated Hansen's testimony that Bowman did in fact access these documents and the victim's Facebook page within days of the shooting.

During Hansen's cross-examination, Bowman's counsel confirmed with Detective Hansen that "it would be very unlikely" that Bowman read all of the documents stored on his computer. As to the files that were opened and viewed, Detective Hansen conceded he could not determine how long the user actually looked at the files. A reasonable trial attorney may have concluded it was more advantageous to argue the State could not prove Bowman had ever read the Book or Manual and rely on Bowman's testimony that he did not do so, rather than run the risk that the defense expert would corroborate much of Detective Hansen's testimony regarding Bowman's accessing these other inculpatory materials, including on the day of the murder.

Dkt. 14-1, Ex. 2, at 30–33.

The Washington Supreme Court also considered this claim and found:

Mr. Bowman argues that his trial attorney was ineffective in failing to consult with and call a forensic computer expert as a witness to counter the State's computer expert regarding the nature of electronic book files and other evidence found on Mr. Bowman's computer. The State argued that those files discussed how

to commit murder without repercussion, and thus demonstrated that Mr. Bowman acted with premeditation. Mr. Bowman proffered expert testimony in support of his petition opining that Mr. Bowman had merely downloaded the electronic books in question amongst a multitude of other books and had never actually read them.

\* \* \*

As to whether counsel failed to investigate and call appropriate expert witnesses, the Court of Appeals rejected those arguments by analyzing only the deficient performance prong of the *Strickland* test. Because the petitioner must establish both prongs to succeed, the court need not address both prongs if the defendant or petitioner cannot establish one of the prongs. *Hendrickson*, 129 Wn.2d at 78. And a petitioner cannot show deficient performance by attacking matters that go to trial strategy or tactics. *Id*. at 77–78. Although the decision to call a particular witness is a matter of strategy and tactics, this presumption may be overcome through evidence demonstrating that counsel failed to conduct a reasonable, material investigation into available defenses and witnesses. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004).

Dkt. 17, Ex. 28, at 321–22.

In the instant petition, petitioner fails to show the state court's consideration of this claim was contrary to or an unreasonable application of clearly established federal law. Petitioner fails to support the contention that his counsel's decision not to retain a separate defense computer expert resulted in assistance falling below an objective standard of reasonableness. "Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 688–89). Further, "the relevant inquiry under *Strickland* is not what defense counsel should have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). Here, counsel's failure to retain a defense computer expert to counter the State's expert may have been a reasonable tactical decision, designed to avoid a defense expert confirming in front of a jury that petitioner did in fact access the relevant documents within days of the shooting. On habeas review, petitioner has not provided anything to demonstrate that trial counsel's failure to retain a defense computer

expert here was in error or that the error changed the outcome of the trial. *Strickland*, 466 U.S. at

689. As such, petitioner's ineffective assistance of counsel claim based on failure to retain a

separate defense computer expert lacks merit. The Court recommends that claim 2 be denied.

### E.    Claim 3

In claim 3, petitioner argues that counsel was ineffective for failing to call a mental health

expert to explain why it was reasonable for petitioner to have no recollection of the shooting.

Respondent counters that petitioner has failed to establish that any deficiency in choosing not to

present a mental health expert caused him actual and substantial prejudice.

Here, Division One reasonably decided this claim on the merits. The court held:

> At trial, Bowman testified that he could not remember the shooting, opining
> that he was in a dissociative episode. He now argues that counsel was ineffective
> by not procuring an expert like Dr. Richard Coder to corroborate this claim that he
> suffered from a dissociative state.
>
> Bowman's primary defense at trial, however, was self-defense, testifying
> that he acted out of fear for his safety. Bowman admitted to shooting Noll, leaving
> the jury to decide whether he acted reasonably under the circumstances. He recalled
> every moment of the incident with the exception of the actual shooting. A
> reasonable defense trial attorney may have made a strategic decision not to focus
> on Bowman's mental health but instead to focus on the self-defense theory. Counsel
> was strategic by not wanting to focus on Bowman's lapse in memory of the
> shooting given that Bowman appeared to have a clear memory of the road rage
> incident that preceded the shooting.

Dkt. 14-1, Ex. 2, at 33–34.

The Washington Supreme Court also considered this claim and found:

> As to the mental health expert, Mr. Bowman testified that he could not
> remember the actual shooting, stating that he believed he had experienced a
> dissociative episode. Mr. Bowman argues that counsel could have called an expert
> like Dr. Richard Coder to corroborate this defense theory. But as the Court of
> Appeals explained, defense counsel could have reasonably believed that
> highlighting this dissociative episode theory would have undermined the overall
> defense argument that Mr. Bowman had acted in self-defense. As with the previous
> argument, there is no basis for review here under RAP 13.4(b).

1    Dkt. 17, Ex. 28, at 323.

2         In the instant petition, petitioner fails to show that the state court's determination of this

3    claim was contrary to, or an unreasonable application of, clearly established federal law. The

4    state court reasonably found no objectively unreasonable performance in counsel's decision not

5    to call Dr. Coder to testify regarding dissociative episodes. Strategic trial decisions, such as

6    whether to call an expert at trial, "rest[ ] upon the sound professional judgment of the trial

7    lawyer." *Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980). *See also Strickland*, 466

8    U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to

9    plausible options are virtually unchallengeable."). As recognized by the Ninth Circuit, "[f]ew

10   decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer

11   a witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999). An attorney may decline

12   to call a witness or expert for a variety of tactical reasons. *See, e.g.*, *Richter*, 562 U.S. at 108–09

13   ("[M]aking a central issue out of blood evidence would have increased the likelihood of the

14   prosecution's producing its own evidence . . . and once matters proceeded on this course, there

15   was a serious risk that expert evidence could destroy Richter's case. Even apart from this danger,

16   there was the possibility that expert testimony could shift attention to esoteric matters of forensic

17   science, distract the jury from whether Johnson was telling the truth, or transform the case into a

18   battle of the experts."); *Downs v. Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000) (witness would have

19   provided little benefit at great risk, as well as duplicative testimony); *Wilson v. Henry*, 185 F.3d

20   986, 989 (9th Cir. 1999) (testimony largely at variance with evidence); *Denham v. Deeds*, 954

21   F.2d 1501, 1505–06 (9th Cir. 1992) (decision to not call a witness counsel believed "would have

22   done 'more harm than good' . . . reflects the skill and judgment one would expect of a reasonably

23   competent attorney").

24

1    Here, petitioner provides no evidence, other than his own speculation, that testimony of a

2    mental health expert would have favorably affected the outcome of the trial. Counsel's decision

3    not to retain a defense expert witness to testify as to petitioner's mental health, but instead to

4    focus on the overlying defense of self-defense, is a tactical decision entitled to deference. *Brown*

5    *v. Uttecht*, 530 F.3d 1031, 1035 (9th Cir. 2008) (holding an attorney's decision relating to

6    selection of potential expert witnesses is a strategic decision entitled to deference). Further, as

7    the state court noted, "[c]ounsel was strategic by not wanting to focus on Bowman's lapse in

8    memory of the shooting given that Bowman appeared to have a clear memory of the road rage

9    incident that preceded the shooting." Dkt. 14-1, Ex. 2, at 33. Absent any contradictory evidence

10   as to trial counsel's approach to petitioner's testimony regarding his state of mind at the very

11   moment of the shooting, trial counsel's decision not to pursue an expert evaluation of petitioner's

12   mental condition at the moment was not unreasonable.

13   Further, trial counsel's alleged error here did not prejudice petitioner. It is not enough that

14   counsel's errors had "some conceivable effect on the outcome." *Strickland*, 466 U.S. at 693.

15   Rather, the petitioner must show "that, but for counsel's unprofessional errors, the result would

16   have been different." *Id*. at 694. "That requires a 'substantial,' not just 'conceivable,' likelihood

17   of a different result." *Pinholster*, 563 U.S. at 189 (quoting *Richter*, 562 U.S. at 112). Petitioner

18   claims here that, in connection with his defense of self-defense, he had a dissociate episode at the

19   moment of the shooting. However, as found by the state court, there is overwhelming evidence

20   that petitioner did not shoot the victim in self-defense:

21       The court observed that Noll [the victim] had his hands on the steering wheel when
         he was shot. It further observed that [petitioner's] actions after the shooting were
22       inconsistent with a person who had just escaped serious injury by an enraged
         motorist, specifically going out to dinner and disposing of the only evidence that
23       would support his version of events.

24

1    Dkt. 14-1, Ex. 1, at 5. Petitioner claims that an expert on dissociate episodes could have

2    explained to the jury how petitioner's lapse of memory supported his testimony that he was in

3    fear for his life (*see* Dkt. 26 at 46), but such testimony cannot explain away the abundance of

4    remaining evidence to support the jury's verdict. Because petitioner has failed to show how

5    counsel's decision not to present expert testimony on this issue would have affected the jury's

6    verdict, he has not established prejudice. Accordingly, the Court recommends that claim 3 be

7    denied.

8    **F.    Claim 4**

9    In claim 4, petitioner argues that counsel was ineffective at trial for failing to offer the

10   entire contents of "The Death Dealer's Manual" ("Manual") and "Murder, Inc., the Book"

11   ("Book") to challenge the State's "student of murder" theory of the case. Dkt. 4 at 11.

12   Respondent counters that it was a reasonable tactic not to seek to admit the entire Manual or

13   Book because not doing so minimized the jury's exposure to the material. Dkt. 13 at 34–36.

14   The state courts reasonably rejected this claim. Specifically, Division One found:

15   "When a writing or recorded statement or part thereof is introduced by a
     party, an adverse party may require the party at that time to introduce any other
16   part, or any other writing or recorded statement, which ought in fairness to be
     considered contemporaneously with it." ER 106. The State introduced portions of
17   the Book and the Manual as evidence to prove that Noll's death was premeditated
     and that Bowman was a "student of murder." After conducting a paragraph by
18   paragraph review, and considering if the excerpts would be unfairly prejudicial to
     Bowman under ER 403, the court admitted redacted portions of the Book, and the
19   Manual. Bowman argues that counsel should have introduced the Book and the
     Manual in their entity to demonstrate that the documents were not guides for
20   committing murder. This strategy, however, likely would have undermined
     Bowman's argument that he never read either document. Bowman's theory at trial
21   was that he bundle downloaded the Book and the Manual unintentionally, and never
     read them. Therefore, counsel employed a reasonable tactic by not offering
22   additional portions of the materials to make an argument about their content.

23   Dkt. 14-1, Ex. 2, at 35–36.

24

1    The Washington Supreme Court also considered the claim and held:

2         Mr. Bowman also asserts that counsel should have put into evidence before
   the jury excerpts from the "murder books" or even submitted them in whole[.] . . .
3    As the Court of Appeals explained, defense counsel's handling of these evidentiary
   matters was a question of trial strategy, and counsel could have reasonably declined
4    to pursue such arguments as opening the door to further criticism of the defense
   theory. Moreover, Mr. Bowman cannot establish that failing to challenge this
5    portion of the State's case in this manner was reasonably likely to have any effect
   on the verdict.

6    Dkt. 17, Ex. 28, at 324.

7         As described in the state court decision, the trial court held a hearing on the admissibility

8    of certain evidence at trial. Dkt. 18, Ex. 37, Verbatim Report of Proceedings (VRP) (Nov. 10,

9    2014). As to the publications at issue here, the court stated, "I think as a general matter these two

10   really need to be treated with some care. They are essentially how-to manuals for how to kill

11   people. There's no doubt that they are disturbing, and while arguably probative of motive and

12   planning, they do run the risk of appealing to passion and prejudice." Dkt. 18, Ex. 37 at 363–64.

13   The court also noted,

14        Now, whether some of this material is admissible to impeach [petitioner] should he
15   testify or to rebut a self-defense claim remains to be seen, but at this point I'm going
   to be really conservative as to what I allow in. The Court has already allowed in a
16   great deal of evidence which the State can use to argue that this crime was carefully
   planned and that [petitioner] had the skills to carry it out, but I think there is a
17   danger that the use of some of the inflammatory language, particularly in the second
   one, the Death Dealer's Manual, make it difficult for the jury to evaluate this case
18   dispassionately.

19   *Id*. at 365. The court then went through the passages highlighted by the State to determine

20   whether they should be admitted or excluded for various reasons ranging from relevancy,

21   prejudice or an inflammatory nature, and duplicity. *Id*. at 365–86. The court also directed that the

22   State was not permitted to use any of the material in the Manual or the Book in its opening

23   statement or case-in-chief, but could introduce it if defenses were raised and the State convinced

24

REPORT AND RECOMMENDATION - 23

1    the court that the probative value outweighs the prejudice. *Id*. at 386. Pursuant to these

2    instructions, the State did not mention the publications in its opening or case-in-chief; rather, the

3    State introduced them when it cross-examined petitioner. Dkt. 20, Ex. 52, at 250–51; 254–56;

4    265–68; 270.

5          Again, respondent here argues that counsel's decision not to seek to introduce all of the

6    Manual or the Book was a strategic decision, not deficient performance as petitioner asserts. "A

7    fair assessment of attorney performance requires that every effort be made to eliminate the

8    distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Moreover, a petitioner must

9    "overcome the presumption that, under the circumstances, the challenged action might be

10   considered sound trial strategy." *Id*. (internal quotation marks omitted). And further, a finding of

11   error is not enough to justify a grant of habeas relief; a petitioner must also establish prejudice.

12   Again, to establish prejudice, petitioner "must show 'that there is a reasonable probability that

13   but for counsel's unprofessional errors, the result . . . would have been different." *Williams v.*

14   *Taylor*, 529 U.S. 362, 394 (2000) (quoting *Strickland*, 466 U.S. at 694).

15         In support of his argument here, petitioner also claims that counsel's decision not to

16   request that the entire contents of the Manual and the Book be admitted violated Washington

17   Evidence Rule ("ER") 106, the rule of completeness. Pursuant to ER 106, a court has the

18   discretion, subject to other rules of evidence, to admit noninculpatory statements which "ought in

19   fairness to be considered contemporaneously." ER 106; 5 Karl B. Tegland, Washington Practice:

20   Evidence § 106.1, at 115 (4th ed. 1999). ER 106 is designed to protect the jury from misleading

21   impressions which might result from hearing evidence out of context. However, if counsel had

22   been permitted under ER 106 to introduce the entire Manual and Book in response to the State's

23   introduction of redacted portions, such general introduction would have undermined defense

24

1  counsel's overlying argument that petitioner did not read these publications in connection with

2  the killing of the victim. Rather, citing to portions of these publications to which the State did not

3  refer would in fact reinforce the State's "student of murder" theory of the case by implicitly

4  implying that petitioner did in fact read them rather than simply unintentionally downloaded

5  them. It was a reasonable tactic for defense counsel to minimize the jury's exposure to these

6  publications and petitioner therefore has failed to show counsel was deficient. *See Siripongs*, 133

7  F.3d at 736 (holding that the relevant inquiry under *Strickland* is whether the choices made by

8  counsel were reasonable).

9       Further, petitioner has not established prejudice. The Court simply cannot conclude that

10 there is a reasonable probability, had trial counsel offered the entire contents of the Manual and

11 the Book, that the jury would have weighed the evidence in favor of a different result. *Strickland*,

12 466 U.S. at 694. It strains logic to consider the entire contents of these "how-to manuals on how

13 to kill people," in petitioner's possession (having read them or not) at the time of the killing, as

14 helpful to the defense. Petitioner thus fails to show a substantial likelihood that the outcome

15 would have changed had the full publications been admitted. Therefore, the state court did not

16 unreasonably apply clearly established federal law, nor make an unreasonable determination of

17 the facts in light of the evidence. 28 U.S.C. § 2254(d). Accordingly, the Court recommends that

18 claim 4 be denied.

19      **G.    Claim 5**

20      In claim 5, petitioner argues that counsel was ineffective for deferring to the client the

21 decision of whether to request a jury instruction on lesser-included offenses. Respondent

22 counters that petitioner has failed to establish that, had counsel given less weight to petitioner's

23

24

1   opinion, counsel would have requested instructions on any lesser-included offenses and the result

2   of the trial would have been different. Dkt. 13 at 39–40.

3          The state court rejected this claim, finding:

4          The decision not to request a lesser included offense instruction is a tactical
           one. "Although risky, an all or nothing approach was at least conceivably a

5          legitimate strategy to secure an acquittal." Here, Bowman's counsel consulted with
           Bowman on this issue "many times in depth," advised Bowman the defense could

6          offer the jury lesser included offense options, and acknowledged the decision not
           to seek lesser included offenses "could be characterized easily as a tactical

7          decision" and "I agree with it."

8          Defense counsel's approach is appropriate under *State v. Grier*:

9          Even where the risk is enormous and the chance of acquittal is minimal, it
           is the defendant's prerogative to take this gamble, provided her attorney

10         believes there is support for the decision. . . . [A] criminal defendant who
           genuinely believes she is innocent may prefer to avoid a compromise

11         verdict, even when the odds are stacked against her. Thus, assuming that
           defense counsel has consulted with the client in pursuing an all or nothing

12         approach, a court should not second-guess that course of action.

13         There is nothing in the record to suggest that defense counsel believed Bowman's
           decision was unreasonable in this case. And the fact that the strategy proved

14         unsuccessful is irrelevant because "hindsight has no place in an ineffective
           assistance analysis." Defense counsel's performance here was not deficient.

15  Dkt. 14-1, Ex. 1, at 19–20 (footnotes omitted).

16         As to counsel's performance, counsel's representation is not required to conform to the

17  best practices or even the most common custom, as long as it is competent representation.

18  *Richter*, 562 U.S. at 105. In review of counsel's actions, every effort should be made to

19  "eliminate the distorting effects of hindsight," and judge counsel's performance from counsel's

20  perspective at the time. *Strickland*, 466 U.S. at 689. Further, a defense counsel's performance is

21  not constitutionally ineffective if he or she, "with adequate knowledge of the law and the

22  evidence," chooses not to request a lesser-included offense instruction as long as such a choice is

23  reasonable. *Butcher v. Marquez*, 758 F.2d 373, 376–77 (9th Cir. 1985). However, merely

24

1    labeling such a choice "'trial strategy' does not automatically immunize an attorney's

2    performance from sixth amendment challenges." *United States v. Span*, 75 F.3d 1383, 1389 (9th

3    Cir. 1996). Counsel's performance is constitutionally deficient if "[c]ounsel's errors with the jury

4    instructions were not a strategic decision to forego one defense in favor or another" but "the

5    result of a misunderstanding of the law." *Id*. at 1390. Turning to a showing of prejudice, again

6    that showing is made when there is a reasonable probability that, but for counsel's errors, the

7    result of the trial would have been different. *Strickland*, 466 U.S. at 694. "The likelihood of a

8    different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

9        In this case, before the trial court brought out the jury for instructions, the court asked

10    counsel if they had any issues to resolve. Dkt. 20, Ex. 53, at 353–63. As to the issue of inclusion

11    of lesser-included offenses in the jury's instructions, the trial court and defense counsel had the

12    following exchange:

13            [Court]: Do you disagree with [the State's] assertion that in addition to indication
14            that this is your client's wish not to include the lesser included that the record also
            needs to establish that counsel agrees with it? That, I think, is the issue.

15            [Defense Counsel]: [Y]es, I know. I read the case [*State v. Grier*, 171 Wn.2d at 40
16            (recognizing that an all-or-nothing strategy, foregoing available instructions on
            lesser crimes, is the defendant's choice even where the risk is enormous and the
17            chance of acquittal is minimal.] . . . I have discussed, the record should reflect, that
            Mr. Lee [second chair defense counsel] and I and Mr. Bowman have consulted this
18            issue many times in depth. And as my personal opinion is that ultimately that
            decision is the defendant's. So Mr. Bowman has made that decision. We all know
19            that he is certainly capable intellectually of making decisions, and I think it could
            be characterized easily as a tactical decision. One that he has made that because he
20            has made it, I agree with it.

    Dkt. 20, Ex. 53, at 355.

21
22        Here, petitioner fails to show the state court's consideration of this claim was contrary to,

    or an unreasonable application of, clearly established federal law. First, petitioner has not

23    established that deferring to petitioner's choice as to jury instructions constitutes deficient

24

1    performance when an all-or-nothing strategy on instructions is considered legitimate. While such

2    an approach is high-risk, it offers a high reward should it be successful and the jury acquits. A

3    high-risk approach to jury instructions does not imply deficient performance on the part of

4    defense counsel. Rather, it is a strategic decision. And here, defense counsel expressly stated that

5    he agreed with petitioner's approach to the relevant jury instructions. Dkt. 20, Ex. 53, at 355. At

6    sentencing, counsel told the jury, "[W]hen I was talking earlier about the jury instructions and

7    the lesser, you think that self-defense was actually the defense, and that's actually what

8    happened, then intellectually and emotionally, it wouldn't make sense to have the lesser." Dkt.

9    20, Ex. 54, at 507–08. These statements signal counsel's clear agreement with petitioner's

10   decision on an all-or-nothing approach with respect to the jury instructions, and now, in

11   hindsight, petitioner has not shown that this strategy was unconstitutionally deficient.

12        Second, even if this approach was deficient performance, petitioner has failed to establish

13   resulting prejudice, namely that counsel would have made a different decision had he given less

14   weight to petitioner's approach, or that the result of the trial would have been different.

15   *Strickland*, 466 U.S. at 694. Counsel expressly supported petitioner's approach to the jury

16   instructions on lesser-included offenses (Dkt. 20, Ex. 53, at 355; Dkt. 20, Ex. 54, at 507–08), and

17   petitioner here has not shown that counsel would have not made the same decision had petitioner

18   not made the decision himself. Thus, petitioner has not established prejudice. Accordingly, the

19   Court recommends that claim 5 be denied.

20                                   **IFP ON APPEAL**

21        Petitioner's *in forma pauperis* ("IFP") status should be revoked for purposes of an appeal

22   of this matter. IFP status on appeal shall not be granted if the district court certifies "before or

23   after the notice of appeal is filed" "that the appeal is not taken in good faith[.]" Fed. R. App. P.

24

24(a)(3)(A); *see also* 28 U.S.C. § 1915(a)(3). A petitioner satisfies the "good faith" requirement if he seeks review of an issue that is "not frivolous," and an appeal is frivolous where it lacks any arguable basis in law or fact. *Gardner v. Pogue*, 558 F.2d 548, 551 (9th Cir. 1977); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Appeal from this matter would be frivolous, so that IFP status should be revoked for purposes of any appeal.

### CERTIFICATE OF APPEALABILITY and EVIDENTIARY HEARING

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only if the petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Pursuant to this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to this petition.

Regarding whether petitioner is entitled to an evidentiary hearing, the decision to hold a hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170 (2011). A hearing is not required if the allegations would not entitle

petitioner to relief under 28 U.S.C. § 2254(d). *Landrigan,* 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see also Pinholster,* 563 U.S. 170. "[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). Under this standard, the Court finds it unnecessary to hold an evidentiary hearing.

### CONCLUSION

The habeas petition (Dkt. 4) should be denied and this case should be closed. No certificate of appealability should issue, and IFP status should be revoked for purposes of any appeal.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on December 2, 2022, as noted in the caption.

Dated this 15th day of November, 2022.

J. Richard Creatura
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 30